# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>IN THE MATTER OF THE SEARCH OF<br>INFORMATION ASSOCIATED WITH<br>fitzgeraldjared@icloud.com THAT IS STORED<br>AT PREMISES CONTROLLED BY APPLE,<br>INC. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 21-sw-00765-KLM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A,"** which is attached to and incorporated in this Application and Affidavit

located in the _____State and_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B,"** which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 2113(a) | Bank Robbery. |

The application is based on these facts:

X   Continued on the attached affidavit, which is incorporated by reference.
☒ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Donald Peterson*
*Applicant's signature*

Donald Peterson, Special Agent, FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   **22 Jul 2021**

*Judge's signature*

City and state:   Denver, CO

Kristen L. Mix
United States Magistrate Judge
*Printed name and tit*

## **ATTACHMENT A**

Location to Be Searched

This warrant applies to information associated with Apple ID fitzgeraldjared@icloud.com (the "account") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, California 95014.

# **ATTACHMENT B**

## Items to be Seized

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside the United States, including any messages, records, files, logs, or information that have been deleted but are still available Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      The contents of all emails associated with the account from July 9, 2020 to April 14, 2021, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the

true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      The contents of all instant messages associated with the account from <u>July 9, 2020 to April 14, 2021</u>, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed or maintained, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

The information should be provided to:

> SA Donald Peterson
> Rocky Mountain Safe Streets Task Force, CR-3
> 8000 East 36th Avenue
> Denver, Colorado 80238
> Or by email at:
> depeterson@fbi.gov

## I.      Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and/or instrumentalities of violations of Title 18 U.S.C. §2113 (Bank Robbery) involving JARED FITZGERALD between July 9, 2020 and April 14, 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.   The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

b.   Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the bank robberies under investigation and the account subscriber;

c.   Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

d.   Online activity related to searches of banking institutions and robberies;

e.   Mapping/routing data to/from banking institutions;

    f.   Communications involving banking institutions, bank robberies, robbery proceeds, planning and/or coordinating robberies;

    g.   Evidence indicating the user's state of mind before, during, and after the 2020-2021 Colorado robberies; and

    h.   Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Apple, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Apple. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Apple, and they were made by Apple as a regular practice; and

b.      such records were generated by Apple's electronic process or system that produces an accurate result, to wit:

    1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Apple in a manner to ensure that they are true duplicates of the original records; and

    2.      the process or system is regularly verified by Apple, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                Signature


31

# UNITED STATES DISTRICT COURT

## FOR THE

## DISTRICT OF COLORADO

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
fitzgeraldjared@icloud.com THAT IS
STORED AT PREMISES CONTROLLED
BY APPLE, INC.

Case No. _____

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Donald Peterson, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     This affidavit is made in support of an application for a search warrant under Title 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the above-listed Apple ID that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, California. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.     Your Affiant is a Special Agent of the Federal Bureau of Investigation (FBI) currently assigned as the Bank Robbery Coordinator at the Rocky Mountain Safe Streets Task Force. Your Affiant is responsible for investigating violent crime in the Denver metropolitan area, including bank and business robberies. Your Affiant has been an FBI Special Agent for approximately 16 years and has training and experience in the investigation of violent crimes, including homicide, robbery, gang-motivated violence, drug offenses, weapons offenses, hate crimes, crimes against children, and civil rights violations. These investigations have utilized physical and electronic surveillance, financial analysis, subject/witness interviews, surreptitious recordings, undercover

operations, search warrants, arrests, utilization of informants, seizure and analysis of computer and telephone information, and various other techniques.

3.      Your Affiant has experience conducting investigations involving computer and cellular telephone exploitation and analysis. Your Affiant is familiar with the types of information and evidence available through such exploitation and analysis. Your Affiant has conducted numerous investigations during which critical information and evidence were obtained through the review of location data, call detail records, and other general communication activity related to computers and cellular telephones.

4.      The facts set forth in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement professionals and witnesses. This affidavit is intended to demonstrate that probable cause exits for the issuance of the requested search warrant. As such, not all information developed during the course of this investigation is provided herein. Instead, only the information required to show probable cause is detailed below.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. §2113 (Bank Robbery) have been committed by JARED LINCOLN FITZGERALD. There is also probable cause to believe that information associated with the Target Apple ID (fitzgeraldjared@icloud.com), as described in Attachment B, constitutes evidence of these criminal violations.

6.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in Title 18 U.S.C. §2711. Specifically, the Court is a District Court of the United States that has jurisdiction over the offense being investigated.

## PREVIOUS 2006 BANK ROBBERIES
## COMMITTED BY JARED LINCOLN FITZGERALD

### April 2006 Two Arizona Bank Robberies

7.      On April 24, 2006, an unidentified man (the robber) entered the Chase Bank at 3970 West Ray Road, Chandler, Arizona. The robber approached the teller counter and handed the victim teller a note that read, "This is a robbery.  I have a gun in the bag." The robber told the victim teller to calm down and to move quickly. The victim teller provided the robber with $1,000 before the robber left on foot.

8.      The robber was described as a white male, 25-35 years old, 6'-6'5", medium build, with light brown hair.

9.      On April 27, 2006, an unidentified man (the robber) entered the Bank of America at 1961 West Baseline, Mesa, Arizona. The robber approached the teller counter and presented the victim teller with a note that read, "THIS IS A ROBBERY. THERE IS A GUN INVOLVED. GIVE ME ALL YOUR MONEY." The robber lifted the front of his shirt and displayed a small handgun in his waistband.

10.     As the victim teller started to retrieve money, the robber said, "No, go for the 100's. Give it all." The robber repeatedly said, "Hurry, you're going too slow." The robber took the money and casually exited the bank.

11.     The robber was described as a white male, 5'11"-6', medium build, with brown hair.

**May 2006 Five Arizona Bank Robberies**

12.     On May 5, 2006, an unidentified man (the robber) entered the Washington Mutual at 3418 North 17th Avenue, Phoenix, Arizona. The robber approached the teller counter and presented the victim teller with a note that read, "This is a robbery, empty your drawers, big bills first." The victim teller explained that the cash was only dispensed through an ATM-style machine requiring a card. The robber collected the note and left on foot.

13.     The robber was described as a white or Hispanic male, 30-35 years old, approximately 6'2", 205-210 pounds with dark hair graying near the temples.

14.     On May 6, 2006, an unidentified man (the robber) entered the Bank of America at 3930 East Broadway, Phoenix, Arizona. The robber approached the teller counter and presented the victim teller with a note that read, "GIVE ME ALL YOUR MONEY. I HAVE A GUN." As the robber placed the note inside his backpack, the victim teller observed a black handgun inside. The robber said, "Give me all your hundreds." The victim teller explained he only had smaller bills. The victim teller gave the robber several small bills and a dye pack device. The robber exited the bank.

15.     The robber was described as a white male, 20-27 years old, approximately 6'2", 180-200 pounds.

16.     On May 12, 2006, at approximately 2:45pm, an unidentified man (the robber) entered the World Savings Bank at 1781 East Warner, Tempe, Arizona. The robber approached the teller

counter and presented the victim teller with a note that read, "I am a robber, I have a gun and due have a bomb, give me the money." The robber demanded 100-dollar bills, but the victim teller only had smaller bills available. After receiving the money, the robber left the bank.

17.    The robber was described as a white male, 20-30 years old, approximately 6'0" with a medium build.

18.    On May 20, 2006, an unidentified man (the robber) entered the Chase Bank at 444 West Broadway, Tempe, Arizona. The robber approached the teller counter and presented the victim teller with a note that read, "Give me all your cash. Do not include dye pack." The victim teller placed a stack of money on the counter, but the robber demanded larger bills. After the victim teller said she did not have any larger bills, the robber took the money and exited the bank.

19.    The robber was described as a white male, 25-30 years old, 5'10"-5'11" and approximately 150 pounds.

20.    On May 23, 2006, at approximately 2:00pm, an unidentified man (the robber) entered the World Savings Bank at 1781 East Warner, Tempe, Arizona. The robber approached the teller counter and presented the victim teller with a demand note. The robber asked, "Remember me?" The victim teller said she did remember the robber from the May 12, 2006 robbery. The robber said, "Do it faster this time." She explained that she still did not have access to larger bills. The victim teller placed a stack of money on the counter. The robber said, "thank you," took the money, and exited the bank.

21.    The robber was described as a white male, late 20's or early 30's, 5'8"-6'0", 180-190 pounds, with brown hair with areas of gray.

**June 2006 Two Wyoming Bank Robberies**

22.    On June 12, 2006, at approximately 12:41 pm, an unidentified man (the robber) entered the Security First at 2501 East Lincolnway, Cheyenne, Wyoming, and handed the bank teller a note. The note directed the teller to go to the safe and place large bills into the canvas bag he provided. The note indicated the robber had a gun; however, no weapon was displayed. The robber left the bank with $1,200.00, including five twenty-dollar bills of recorded bait bills.

23.    The robber was described as a white male, approximately 6'0" tall, 170 pounds, an unshaven face and dark hair, with graying hair around the ears.

24.    On June 29, 2006, at approximately 9:20 a.m., an unidentified man (the robber) entered the Bank of the West at 410 SE Wyoming Boulevard, Casper, Wyoming. The robber walked to the center island of the lobby and appeared to be writing on a deposit slip. After a few moments, he approached the financial services officer, showed her a deposit slip and asked about "opening a business account." He then handed her a stack of stapled papers and told her to read the last one. Based on her memory, the note read as follows:

> This is a bank robbery. Go to your vault and fill up the bag. Don't talk to anyone. I have a gun. You have 23 seconds. When I get the bag back I will dump it out on the lobby floor to check for dye packs.

25.    She then told him that it would require another teller to enter the vault and he replied, "O.K." She entered the vault with a second teller and then, among themselves, asked what bag to use to put the money in. The robber answered by telling them to "use this bag." She retrieved the black canvass bag, filled it with money from the vault, and handed it over the counter back to the robber. He then departed the bank in an unknown direction. No weapon was seen by the teller.

26.    One teller described the robber as a white male, 6' to 6'4", medium build with dark, short hair with some gray on the sides.

**July 2006 Utah Bank Robbery**

27.    On July 20, 2006, an unidentified man (the robber) entered the Credit Union One at 1773 West North Temple, Salt Lake City, Utah. The robber told a bank employee, identified as H.R., he was new to the area and he was interested in opening a business account associated with a new McDonald's franchise. The robber said he would return the following day with his partner to complete the process.

28.    On July 21, 2006, the robber returned to the credit union. He sat down in H.R.'s office and said his business partner would be right in. The robber then gave H.R. a note that stated (in summary) not to move to the left or right and that she had 30 seconds to go to the vault and get money and get money and get out and that if she didn't wait 30 seconds after he left to push the alarm, she would be the first to be shot.

29.    H.R. complied with the demands. She asked a co-worker, identified as M.G., to accompany her to the vault because access required two employees. H.R. put the money from the vault into a bag provided by the robber. The robber then left the bank with $70,000.

30.    The robber was described as a white male in his late 30's, 6'1"-6'2" with salt and pepper hair.

## ARREST, INTERVIEW, AND CONVICTION
## OF JARED LINCOLN FITZGERALD

31.    On August 1, 2006, JARED LINCOLN FITZGERALD was arrested and charged with robbing the two banks in Wyoming in June 2006. On June 1, 2007, FITZGERALD was sentenced by United States District Court Judge Clarence Brimmer, District of Wyoming, to 168 months of incarceration followed by 36 months of supervised release. The plea agreement included the Utah bank robbery in July 2006. Although FITZGERALD confessed to the Arizona robberies detailed above, the plea agreement did not include these robberies because, as documented by the investigating agent, the AUSA believed the sentence FITZGERALD received in Wyoming was sufficient.

32.    At the time of his arrest, FITZGERALD was interviewed at the Laramie County Sheriff's Department located in Cheyenne, Wyoming. FITZGERALD was advised of his Miranda rights utilizing the FBI FD-395. FITZGERALD stated he understood his rights and that he wished to waive his rights. FITZGERALD provided the following information:

33.    On April 15, 2006, FITZGERALD walked away from a Colorado Department of Corrections halfway house where he was serving a sentence for auto theft. His status in the halfway house was being revoked and he was scheduled to be returned to a Colorado prison, where he would serve the remaining two years of his sentence. FITZGERALD left Colorado and traveled to Arizona.

34.    FITZGERALD traveled to Arizona and rented a room. He resided in Tempe, Arizona, from late April through the beginning of June 2006. FITZGERALD began robbing banks in Tempe, Arizona, as a means of supporting himself financially. He robbed approximately five banks while residing Tempe. FITZGERALD recalled robbing two Bank of America banks and three smaller banks. FITZGERALD robbed a bank every six to seven days from the end of April through May 2006. FITZGERALD always presented a note to the bank employee, was polite, and never used a firearm; however, the notes stated he had a firearm.

35.    During one of the Phoenix bank robberies, the bank employee placed a dye pack in with the money provided to FITZGERALD. The dye pack exploded approximately twenty feet outside the bank. FITZGERALD later placed the money in a washing machine, but the dye was not

removed. He then placed the currency in a bathtub and poured lacquer over the money. The lacquer removed the dye. FITZGERALD was advised that several of the bills located in his wallet at the time of his arrest appeared to have been from the group which had been inside the bag with the dye. FITZGERALD confirmed the bills in his wallet were the last remaining from the dye pack.

36.    FITZGERALD left Arizona at the end of May or the first of June 2006, and traveled back to Denver, Colorado. He robbed two banks in the Denver area within approximately two weeks. FITZGERALD received approximately $3,000.00 from each bank. FITZGERALD described the location of the banks as being smaller banks located in residential areas. He utilized a taxi for transportation to and from the Denver robberies. In trying to provide an accurate timeline, FITZGERALD stated that the two Denver robberies could have occurred one on either side of the Security First robbery in Cheyenne, Wyoming, which occurred on June 12, 2006; however, it was his best recollection that the Denver robberies occurred prior to June 12, 2006.

37.    FITZGERALD arrived in Cheyenne, Wyoming, on June 5, 2006. FITZGERALD robbed the Security First bank, 2051 East Lincolnway, Cheyenne, Wyoming, on June 12, 2006. He received approximately $1,000.00 in the robbery. FITZGERALD parked the black Chevrolet Corvette he was driving in the alley near the rear exit of the bank.

38.    The white sports coat, tan baseball cap and black dress shoes, which were seized by the Laramie County Sheriff's Department at the time of FITZGERALD's arrest, were the same articles of clothing worn by FITZGERALD during the robberies of Security First, Bank of the West, located in Casper, Wyoming, and the attempted robbery of Sterling Bank, located in Billings, Montana.

39.    On June 29, 2006, FITZGERALD robbed the Bank of the West, located in Casper, Wyoming. FITZGERALD changed the wording on the note he provided the bank employee. The note announced the robbery and instructed the bank employee to retrieve the money from the vault. The Bank of the West robbery was the first time FITZGERALD instructed the bank employee to take the money from the vault or provided a duffle bag in which to place the money. He obtained approximately $20,000.00 from the Bank of the West. FITZGERALD traveled to either Cheyenne, Wyoming, or Denver, Colorado, following the Bank of the West robbery.

40.    On July 19, 2006, FITZGERALD attempted to rob the Sterling Bank, located in Billings, Montana. FITZGERALD approached a female whom he thought was the manager; however, the

employee was not the manager. FITZGERALD handed the employee the note instructing her to remove the money from the vault. FITZGERALD became nervous as he had been in the bank too long. FITZGERALD left the bank without any money. FITZGERALD stated, "I went in there at the wrong time. The bank manager wasn't there and the lady I spoke to did not have keys to anything." FITZGERALD drove to Blackfoot, Idaho, following the attempted robbery of the Sterling Bank, where he spent the night in a hotel.

41.   On July 20 or 21, 2006, FITZGERALD was en route to Reno, Nevada when he stopped in Salt Lake City, Utah. FITZGERALD went into a Federal Credit Union, located approximately five minutes from downtown Salt Lake City, and spoke with the credit union manager. His original plan was to rob the credit union; however, there were too many people inside so he left without giving the manager the note, which would have announced the robbery.

42.   On July 22 or 23, 2006, FITZGERALD returned to the credit union in Salt Lake City, which he had visited the day before. FITZGERALD approached the same manager and handed her a note announcing the robbery. FITZGERALD handed the credit union manager a red duffle bag, which she filled with money from the vault. FITZGERALD was out of the bank approximately 20 seconds after giving the manager the note announcing the robbery. FITZGERALD got into his car and left the area. FITZGERALD received approximately $70,000.00 from the credit union robbery.

43.   FITZGERALD was in Reno and Windover, Nevada, July 24-25, 2006. FITZGERALD gambled at local casinos and in private poker games, which took place at private residences. He learned of the private poker games while conversing with various individuals in the casinos. FITZGERALD indulged in sports betting and poker at the Rainbow and Montigo Bay casinos.

44.   FITZGERALD was in possession of approximately $55,000.00 at the time of his arrest. He advised that approximately $20,000.00 to $30,000.00 was derived from gambling, with the remainder being proceeds from the bank robberies he had committed.

45.   It was FITZGERALD's practice not to go into a bank prior to the time he planned to carry out the robbery. In the event the bank had a high volume of people or there was no rear exit, FITZGERALD would simply leave the bank. FITZGERALD picked banks which had parking in the rear and he would structure his robberies to take place at times he estimated would be slow. FITZGERALD went into at least two banks which did not meet his criteria, so he simply left the banks without attempting the robbery. FITZGERALD wrote out the notes he used to announce the

robbery prior to entering the bank. FITZGERALD made sure he always retrieved the note from the bank employee prior to leaving the bank. FITZGERALD shredded the note and either burned the pieces or flushed the pieces down the toilet.

46.  Troy VanOrden is a friend of FITZGERALD who resides on Wimbledon Court, Colorado Springs, Colorado. VanOrden has no knowledge of FITZGERALD's criminal activity. FITZGERALD requested he be allowed to retrieve several telephone numbers which were stored in the memory of his cellular telephone. The cellular telephone had been seized by the Laramie County Sheriff's Department at the time of his arrest. The following telephone numbers included Troy VanOrden 719-640-2290.

47.  FITZGERALD advised he committed the bank robberies because he needed money. FITZGERALD described robbing banks as a means of obtaining "easy cash" and stating "any dummy can do it."

## RELEASE AND ONGOING CRIMINAL ACTIVITY
## OF JARED LINCOLN FITZGERALD

48.  FITZGERALD was released from federal prison on or about October 31, 2018. After satisfying a state term of incarceration, he started his federal supervised release program in Colorado on January 8, 2020. His current address of record with U.S. Courts Probation and Pretrial Services is 2435 Wimbleton Court, Colorado Springs, Colorado. His telephone number is 303/242-9535 and his email address is fitzgeraldjared@icloud.com. Colorado Department of Labor records show he has been employed by JDT Incorporated since the first quarter of 2020. JDT Incorporated is the parent company of Mountain Cellars liquor store at 8290 Razorback Road, Colorado Springs, Colorado. FITZGERALD's probation officer confirmed he works at Mountain Cellars and his direct supervisor is Troy VanOrden. FITZGERALD reported to his probation officer that he drives an older model Mercedes-Benz GL550 SUV.

### July 24, 2020 MidFirst Bank Robbery

49.  On July 24, 2020, at approximately 9:45am, an unidentified man (the robber) entered the MidFirst Bank at 101 North Cook Street, Denver, Colorado. The robber approached the desk of bank employee J.M. carrying a clipboard. He flipped the clipboard over and showed J.M. a note taped to the back. The note said, "This is a robbery." The robber then addressed all three bank

employees by saying something similar to "There is a problem. The problem is you're being robbed." The robber lifted the front of his shirt to reveal a black handgun in his waistband. The robber ordered all the employees to the vault.

50.    J.M. and co-worker C.H. struggled to open the vault because they were afraid. The robber became increasingly hostile and began yelling at them. At one point, he began counting down and the employees feared they would be shot. Their third attempt to access the vault was successful. The robber placed $124,100.00 from the vault into a backpack. He ordered the employees to stay inside the vault as he exited the bank.

51.    The robber was described as a white male in his 30's or 40's, approximately 6'0"-6'3" tall with a medium build. He wore Carhart style pants, a bright yellow shirt with reflective lines, a yellow hard hat, and a face covering.

52.    J.M. described a suspicious incident that occurred approximately two weeks prior at the bank. A man entered the bank dressed as a construction worker. The man said there was an issue with the water control valves located behind the teller counter. J.H. escorted the man to the back of the bank where he apparently was satisfied the issue had been resolved. He then left the bank. J.M. believed the incident was related to the robbery.

53.    Your Affiant reviewed images from the suspicious incident on July 9, 2020, and from the robbery on July 24, 2020. The individual in both events was wearing what appeared to be the same shirt and hard hat and had matching physical descriptions. Your Affiant believes the same man was involved in both events.




July 9, 2020 Suspect                                July 24, 2020 Suspect

## October 9, 2020 MidFirst Bank Robbery

54.     On October 9, 2020, at approximately 9:25am, a white man (the robber) entered the MidFirst Bank at 101 North Cook Street, Denver, Colorado. The robber approached the gate to the teller line with a gun in his hand. He ordered bank employees J.M. and C.H., who were both present during the previous MidFirst robbery, to access the vault room. C.H. asked the robber what would happen if she did not comply. The robber pointed his gun at J.M. and said, "I'll shoot this bitch."

55.     The robber forced all bank employees into the vault room. He said, "If the cops come there will be a shootout." The robber removed cash from both safes inside the room. He put $223,136.00 into a duffel bag before leaving the bank.

56.     J.M. was sure the robber was the same person who robbed the bank on July 24, 2020.



October 9, 2020 Suspect

## April 13, 2021 Pueblo Bank Robbery

57.    On April 13, 2021, at approximately 9:00am, an unidentified male (the robber) entered the Power Credit Union located at 1615 East Evans Avenue, Pueblo, Colorado. He was wearing a reflective construction vest, a yellow hard hat, black sweatpants, and new black and white Adidas shoes. He was described as a white male, approximately 6'2", approximately 170 pounds, approximately 35 years old, with short dark hair and light-colored eyes. The robber was greeted by C.M. He requested to speak with the manager regarding asphalt work in the bank parking lot. The robber signed-in with the name "Marcus Briness."

58.    V.T. came out to assist the robber. He told V.T. he worked for ADP and he was there to complete some asphalt work. V.T. explained that they had hired another company for the asphalt work. At that time, the robber said he wanted to show V.T. the work order. The robber then displayed a robbery note in a notepad attached to a clipboard. The demand note read as follows: "YOU ARE BEING ROBBED I SEE COPS = YOU DIE TO ENSURE YOUR SAFETY YOU MUST DRAW EMPLOYEES AWAY FROM ALARMS NO DYE PACKS OR TRACKING DEVICES GO TO SAFE."

 

April 13, 2021 Suspect



April 13, 2021 Robbery Note

59.   The robber told V.T. to remain calm and to move quickly so he would not have to hurt her. He directed V.T. to open the vault. V.T. explained that she needed to retrieve the combination from her office and that she would need a second person to access the vault. V.T. first asked A.B. to assist her in opening the vault and later asked S.K. to help them as well. At one point, the robber told A.B. he would take them hostage if the police showed up.

60.   The robber directed all three bank employees to sit down inside the vault as he removed the money from the safe and placed it into a black plastic bag. The robber took $56,280.00. After removing the money, he ordered V.T. to walk him out of the bank. V.T. watched the robber enter a silver vehicle parked south of the bank on Canal Street.

61.   Responding officers recovered several items of evidence from the bank, including a brown clipboard with a notepad attached. The clipboard and notepad were left by the robber on top of a safe inside the vault.

62.   In addition to the robbery note, Investigator Cardona of the Pueblo Police Department observed a list of names and telephone numbers written on a piece of paper contained within the notepad left by the robber. Various types of alcohol were listed by most of the names.



63.    Investigator Cardona contacted several individuals on the list. One male on the list said the alcohol written by his name is his favorite beverage and that he purchased the rare liquor from Mountain Cellars in Colorado Springs. A second male, interviewed later by your Affiant, said he placed his name on a list at Mountain Cellars in Colorado Springs and asked to be contacted if a certain rare liquor became available. One female on the list said the alcohol listed next to her name is a rare wine that she could only find at Mountain Cellars in Colorado Springs. Others on the list said they did not know why their names were included, and some said they put their names on multiple contact lists.

64.    Based on these responses, your Affiant believes the list was generated during the normal course of business at Mountain Cellars liquor store in Colorado Springs. The list was created to keep track of customers who should be contacted when specific types of rare alcohol became available.

65.    On July 7, 2021, your affiant received several hand-written documents completed by JARED FITZGERALD. The documents were provided by FITZGERALD's probation officer and included multiple travel authorization requests. The first request was FITZGERALD asking for

permission on March 3, 2021, to travel to Boca Raton, Florida to visit his girlfriend, Tara Yesbick. The second request was FITZGERALD asking for permission to travel out-of-state between April 21, 2021, and May 19, 2021, to get married, visit his in-laws, and to go on his honeymoon.

66.    Your affiant visually compared the writing of the bank robbery note from the Power Credit Union robbery with the two documents completed by FITZGERALD. Your affiant determined the writing in the bank robbery note was consistent with the writing in the documents completed by FITZGERALD. The comparison items are as follows:



 Robbery Note           Honeymoon Request

67.   In addition to the bank robbery note and the list of customers, the notepad also contained a sheet of paper with information related an Apple MacBook Pro computer. The serial number for the computer was listed as C02Q3B3FG8WN. On July 9, 2021, your Affiant reviewed registration information provided by Apple related to the computer. Apple records show the computer is owned by JARED FITZGERALD at 2435 Wimbleton Court, Colorado Springs, Colorado, telephone number 303/242-9535, email address fitzgeraldjared@icloud.com. The previous registered operator of the computer was FITZGERALD's current supervisor, Troy VanOrden.

68.   A review of the previously-described travel authorization requests showed that FITZGERALD utilizes both the fitzgeraldjared@icloud.com email address as well as an email address of jaredfitzgerald0@gmail.com (Target Google Account). On June 30, 2021, FTIZGERALD sent an email to his probation officer to provide his monthly financial statement. The header information in the email shows FITZGERALD emailed the statement from jaredfitzgerald0@gmail.com to fitzgeraldjared@icloud.com before forwarding the email to his probation officer.

## FINANCIAL INFORMATION

69.   FITZGERALD filed a travel request with his probation officer seeking authorization to travel to Boca Raton, Florida by air. He planned to visit his girlfriend, Tara Yesbick, from January 14, 2021, through January 19, 2021. He stated the trip would cost $200.

70.   On March 3, 2021, FITZGERALD filed another travel request seeking authorization to travel to Boca Raton, Florida by air.  Again, he planned to visit his girlfriend, Tara Yesbick.  He estimated the trip would cost $200.

71.   FITZGERALD filed another travel request seeking authorization to travel throughout the United States between April 21, 2021 and May 19, 2021, for his wedding and honeymoon. He represented he would be driving to Las Vegas where he planned to stay at the MGM Grand hotel. He would then drive to San Antonio, Texas, where he would be staying in a rental house before driving on to Florida to stay in another rental house. He listed $3500 as the total cost of the trip.

72.     Your affiant reviewed a financial report dated April 21, 2021, showing that FITZGERALD's girlfriend, Tara Yesbick, purchased a 2021 BMW X3 for $54,749. She paid $17,500 in cash and listed "office manager" as her occupation. The report for the transaction was filed the same day FITZGERALD and Yesbick reportedly started their honeymoon.

73.     FITZGERALD consistently provides $2,461 as his monthly income and $1,500 as his monthly rental expense. On March 3, 2021, he provided $2,461.56 as his monthly income with no other sources of income. His monthly expenses were listed as $2,460.30, including a trip to Florida for $100.

74.     Your Affiant believes FITZGERALD intentionally under-reported the expenses related to each of these trips. Your affiant believes FITZGERALD supplements his travel and living expenses with proceeds from his bank robberies.

75.     On October 20, 2020, a 2017 Maserati Ghibli luxury vehicle was registered and titled to FITZGERALD. The base price of the vehicle is listed as $77,200. The vehicle was observed parked at the Walmart adjacent to Mountain Cellars in May 2021. Your Affiant believes FITZGERALD hides the vehicle from his probation officer and others because his reported monthly salary would not support owning and maintaining such an expensive vehicle. Your Affiant believes FITZGERALD pays for the vehicle with proceeds from his bank robberies.

## SUMMARY

76.     Your Affiant believes the same person is responsible for the robberies of the MidFirst Bank on July 24, 2020, the MidFirst Bank on October 9, 2020, and the Power Credit Union on April 13, 2021. The suspect in the two MidFirst robberies was identified by the victims as the same person, and the suspect made statements confirming he was responsible for both robberies. Additionally, the physical description and the modus operandi of the robber in each of the MidFirst robberies are consistent.

77.     The physical description of the suspect in the Power Credit Union robbery matches the physical description of the MidFirst robber. The Power Credit Union robber was wearing white and black Adidas shoes that match the shoes worn by the robber during the second MidFirst robbery. The Power Credit Union robber was also wearing a yellow hard hat that appeared to be the same one worn during the first MidFirst robbery. The robber in the first MidFirst robbery used a clipboard and a construction ruse to gain access to the bank. The robber of the Power Credit

Union also used a clipboard and a construction ruse. The suspect in all three robberies focused exclusively on the vault, which is a rare occurrence.

78.     Your Affiant believes JARED FITZGERALD is responsible for all three robberies. FITZGERALD has a long, extensive history of robbing banks. FITZGERALD's modus operandi evolved during his robberies in 2006. He started by robbing individual tellers using a demand note. The amounts of money he took during those early robberies were minimal. Prior to his arrest in 2006, FITZGERALD started using a ruse to scout the bank prior to the robbery and to contact a management-level bank employee who would have access to the vault. By his last robbery in 2006, FITZGERALD was focused exclusively on the vault where he was able to steal a more significant quantity of money.

79.     Your Affiant believes FITZGERALD used the notepad left at the Power Credit Union robbery during the normal course of business at the Mountain Cellars liquor store where he is currently employed. In addition to the robbery note, the notepad also included customer lists, office supply lists, and information related to an Apple MacBook computer (which is owned by FITZGERALD). He used the notepad to write and present the robbery note, and he accidently left it behind during the robbery. As demonstrated above, the writing in the robbery note is consistent with known writing samples from FITZGERALD.

## INFORMATION REGARDING APPLE ID AND iCLOUD[1]

80.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

81.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

---

[1]     The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

a.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.  iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.  iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.  Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.  App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

82.   Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

83.   An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

84.   Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

85.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

86.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

87.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging

service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

88.    Your Affiant believes information associated with the Target Apple ID (fitzgeraldjared@icloud.com) will assist investigators in determining FITZGERALD's locations and activity around the three 2020-2021 bank robberies detailed above. In your Affiant's training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

89.    FITZGERALD's location, search history, mapping/routing information, communications, image collection and storage, and other activities associated with the Target Apple ID will allow investigators to gather evidence of FITZGERALD's potential involvement in the two MidFirst robberies and the Power Credit Union robbery. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based you Affiant's training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

90.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

91.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

92.     Other information connected to an Apple ID may lead to the discovery of additional evidence (financial institution information, accounts used for depositing/transferring funds). For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

93.     Therefore, Apple's servers are likely to contain stored electronic communications and information related to the Target Apple ID and FITZGERALD's use of Apple's services. In your Affiant's training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

94.     Your Affiant anticipates executing this warrant under the Electronic Communications Privacy Act, in particular Title 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

95.     Based on the forgoing, your Affiant requests that the Court issue the proposed search warrant.

96.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

97.    Your Affiant further requests that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,
/s/ Donald Peterson__
Donald Peterson, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on_____July 22_____, 2021

UNITED STATES MAGISTRATE JUDGE

Reviewed and submitted by Brian Dunn, Assistant United States Attorney.